Hear you, hear you, hear you. The United States Court of Appeals for the Fifth Circuit is now open according to law. God save the United States and this honorable court. Good morning, everybody. Happy Monday. We just have one case set for argument this morning. It is 25-11055 Jackson et al. The Tarrant County et al. Apologies in advance for my robeless appearance. I'm in Austin. My robe is not. It is somewhere between New Orleans and Austin. So I'm a bit like Batman without my cape this morning. But bear with me. And Ms. Jackson, we'll first hear from you. I'm so sorry. I'm so sorry. I was reading under the party's column and not the attorney's column. Take it away. That's quite all right. And good morning, your honors. And may it please the court. And I want to say thank you for your honors taking the time off schedule to hear this important case. My name plaintiffs in this case. And this case is interesting in that it is narrow on the facts and on its practical impact, but I think critical on the law. And I'll start here with the kind of narrowness of the case. We know of no other case, certainly none cited by defendants in which a governmental body has voluntarily engaged in this kind of needless and unjustified disenfranchisement, combining staggered elections with this mid-cycle, you know, unusual redistricting with an unabashed political purpose. This case doesn't touch the ordinary politicized decisions and line drawing of maps. It's not a partisan gerrymandering case. And it doesn't even touch a typical mid-cycle redistricting that we're seeing in some states, often at the congressional level, Texas included. But it is a really critical case on the law because it needs to reaffirm a basic principle, protecting the First Amendment and the right to vote. Our politics are highly politicized. It can feel like it's all is fair in attacking one's political opponents. And of course, politics is a tough game. Candidates need to have a thick skin and parties have the right to play to win. The buck stops at attacking voters directly by interfering with their direct access to the ballot in any given election because you don't like who they tend to vote for, or even worse, because of who you assume they will vote for because of the color of their skin. And indeed, that proposition that legislators cannot decide who can vote and when based on their viewpoint or the color of their skin is so obvious that defendants do not attempt to refute it. But instead, they do everything they can to avoid plaintiff's actual claims and rather try to recast them as vote dilution claims. But of course, this appeal is not about vote dilution, but rather about who can vote when. The Constitution and the Supreme Court have been exceptionally clear on that point. Legislators cannot decide who can vote when based on which voters they prefer. That is Dunn, that is Harrington v. Rash, that is Kramer, and so on. Let me jump in with a jurisdiction question or two. So we all know Rucho Barr's partisan gerrymandering claims as political questions. And I guess my question is, what is the limiting principle? How is your viewpoint discrimination claim any different? How does it not sort of collapse into the same kind of partisan gerrymandering claims that are foreclosed by Rucho? Thank you, Your Honor. I agree that that's the question at the heart of this case. I actually think the limiting principle is quite easy. It's what's the type of harm being alleged. If it's vote dilution, you're out of luck. There's no viewpoint discrimination claim for vote dilution. That is what Rucho says, right? There's always going to be politics in deciding how to draw the lines, and there's no limiting principle, no judicially manageable standard in deciding how much politics can affect kind of vote dilution in a line-drawing case. If the harm that you're alleging is discrimination in access to voting, in disenfranchisement, temporary or not, then that case has nothing to do with Rucho. It has everything to do with the more typical viewpoint discrimination case, like a Carrington v. Rash that said you can't fence out voters based on their viewpoint. Well, you call this disenfranchisement, but your clients will vote in 2028. So is the right you're asserting really just the right to vote on schedule, the right to vote at a certain specified time? I think it's the right to vote on equal par with other voters and to access the ballot at the same time that other voters get the right to vote, and to vote based on the schedule that's set by the state constitution, yes. So thinking about Dunn, I think is a perfect case. The voters who were challenging durational residency requirements were definitely going to get to vote in the next election, right, as long as they stayed residents. So that is plainly the case that delaying your access to vote is a disenfranchisement harm, and Dunn talked about the case as total disenfranchisement, even though of course it was only disenfranchisement for one election cycle. And so I think that case answers it. You look at a case like Bush v. Gore, there's no right to vote in presidential elections at all, but once you extend that right, you have to extend it equally. But if we accept that vote postponement is cognizable, justiciable, I guess my question is what principled line keeps every staggered term redistricting from becoming a federal constitutional case? I think that's a great question, your honor, and I think the question is not about whether or not the harm is cognizable, but whether or not it's meritorious, right? So I do think that when you are facing disenfranchisement because of changing of lines and staggered elections, that's a cognizable harm, and actually all of the cases that address staggered elections do not claim that there's not a cognizable harm there, but rather find that it's not a meritorious claim. And I think that's rather easy to do because the court recognizes that this is an inevitable consequence of normal redistricting and that it's ordinarily not done in a discriminatory fashion. It's just a necessary consequence of, you know, the state interest in having both staggered elections and equal apportionment. I think I'm just stuck that if we hold that Rucho does not apply to bar claims of viewpoint discriminatory vote postponement, I just wonder what vitality Rucho retains, if any, in jurisdictions where you have staggered elections. Sure, your honor, a couple of responses. I think you can address these questions exactly the way that every other case that has addressed staggered elections has, which is to say it it is a harm, but it's a harm that's entirely justified by the needs of redistricting, the needs to equal apportionment, the needs to, you know, the state interest in having staggered elections, which have important governmental interest and kind of continuity of governance and whatnot. You can recognize all those interests as justifying it. And of course, you know, the vast majority of cases are not staggered election cases, and so Rucho is obviously at play there. Rucho is also going to be at play in a normal redistricting cycle. Once the state, you know, once, say, Tarrant County in 2030 has to redistrict in order to equalize population, then a claim about viewpoint discrimination is really going to fall flat because that's really going to be a Rucho case. Moving beyond jurisdiction, why isn't Pate v. El Paso County directly on point, and why isn't it binding against you? What language in Pate leaves you any room to maneuver? Because Pate does what every other staggered election case, which says that it was not discriminatory. So, Pate says, yeah, generally you're going to have staggered elections and redistricting, and it's an inevitable consequence of the combination of things, that sometimes voters are going to face this kind of temporary disenfranchisement. I don't remember if that's a harm that's justified by those state interests, you know, and it's not so severe that we're not going to allow for it under those circumstances. But Pate, I think even the district court recognized that Pate said, you know, that is a case where there's not a claim of invidious discrimination. Of course, there is a claim of invidious discrimination here, both on the basis of viewpoint and race. Ms. Lang, that leads into my question, and I want you to clarify this for me, because you have a bunch of claims in this case, but the district judge dismissed your First Amendment claims, and yet you seem to be, in your briefing, pressing for a preliminary injunction on your First Amendment claims, or the aspects of them, and I'm lost as to how you get to throwing your case out on the First Amendment, and with the final judgment, and then take that up on appeals. Clarify for me, you say in your brief you want a preliminary injunction, you assume the First Amendment claims. Why do we even need to reach the First Amendment claims? Thank you, Your Honor. We have a right under U.S. 1292 to appeal any denial of a preliminary injunction, and so I've faced a number of cases where there's kind of a marrying, a dismissal, and a denial of a preliminary injunction at the same time, and in those circumstances- What's your authority for that? Do you have a Fifth Circuit case saying you can do that? I don't have one handy, Your Honor, but I could certainly probably find one for my rebuttal, and I will aim to do that, but I think it's a necessary outgrowth of the right to appeal a denial of a preliminary injunction, because otherwise you would be in the circumstance where anytime you're denied a preliminary injunction, but also have your case dismissed at the same time, which is not uncommon, you would kind of lose that right to an interlocutory appeal of the denial of a preliminary injunction. He did not deny the preliminary injunction for you. He said your First Amendment claims are dismissed. He said, I grant a preliminary injunction as to everything but the First Amendment claims. Well, he denied a preliminary injunction across the board. Well, this is what he says. How about let me read you what he said. Yes, please, Your Honor. The court denies plaintiff's motion for preliminary injunction in full. The court grants defendant's motion to dismiss only as to plaintiff's First Amendment claims. The court therefore dismisses with prejudice plaintiff's First Amendment claims. This order serves to grant plaintiff's motion to expedite. Yes, Your Honor, so I think that first part of the sentence is the denial of the preliminary injunction in full, and one of the claims for a preliminary injunction was the First Amendment claim, and so we are entitled to appeal that denial of the preliminary injunction in full. I would note that there are three claims at issue in this appeal. One is a right to vote claim, straightforward Anderson verdict. One is a viewpoint discrimination claim, and one is a racial discrimination claim. I think you're going to get to a very similar result under the kind of right to vote claim under Anderson verdict as well, because you're not going to be allowed to engage in viewpoint discrimination under a vote claim as much as you're not allowed to do so under a First Amendment claim. But again, I would say that that first part of the sentence that you read there, Your Honor, is what gives this court jurisdiction over the denial of the preliminary injunction in full as to all the claims that were put forward there. Ms. Lang, you want to pivot to your race claim? You're down to under three minutes. Yes, Your Honor, I would be happy to do that. I would say that first, I think it's really important that this court clarify the standard here. You know, the court applied a racial gerrymandering kind of predominant standard to this disenfranchisement claim, and I think that kind of confuses things on at least two levels. And I understand that, you know, the voting cases are riddled with different standards or whatnot, and so this is not a so much as a need, I think, for this court to set the record straight on two things. One is that this is a disenfranchisement case, not a dilution case, and so racial gerrymandering really just doesn't apply. But even if it was in the vote dilution space, the intent claims are just different than racial gerrymandering. And so the Supreme Court has been very clear, including in Alexander most recently, that if you're making a racial gerrymandering claim, which is just to say voters were kind of sorted on the basis of race, that's a predominant standard. But if you're actually saying that legislators were trying to harm voters on the basis of their race, that's an intent claim. It's governed by Arlington Heights, and it's never permissible, even if it wasn't your predominant purpose. So what is the single, what is your single best piece of evidence in the record that race, not party, but that race motivated the adoption of MAP-7? I'm going to skirt your question a little bit to say two things that I think combined are most important. One is Judge O'Hare's comment, right? He was asked directly, you know, what do you think about the impact that this is going to have on Black voters? And he didn't say, oh no, we weren't trying to harm Black voters, you know, that's at best incidental, you know, we were really focused on race. But instead he said, you know, it's a shame Black voters are continuing to vote for Democrats. And so until they get on board, this is the kind of impact they're going to see. And I think that kind of is a proxy for politics. Let me follow up. So even taking Judge O'Hare's NBC comment at face value, you know, we always often play devil's advocate here on the bench. So how does criticism of democratic policies equal racial bias? I don't think it was a criticism of racial policies or democratic policies. That's the problem. If they were, if Judge O'Hare was to say, you know, I think Black voters are wrong to vote for Democrats. I wish they would vote for Republicans on its own. I think that that would be a different question, right? And instead what he was saying is like, that's why they're facing this consequence, which is that we have targeted them so that they will not be able to have same vote. And just to kind of add my second piece of evidence that I think is really crucial to marry with it is while there is obviously both a racial and partisan impact here, the racial impact is bigger, right? So one out of 20 Anglo white voters are going to be impacted by this disenfranchisement. One in six Black voters, one in eight Latino voters. That is a much bigger impact than the Democratic-Republican impact, which is, you know, just shy of 50% of voters are Democratic. Over 60% of affected voters are Democratic. That's an impact, but it's nowhere near the kind of impact as it is on race, which I think tells us that they were achieving this. We'll hear you back on rebuttal in about 20 minutes, but we're going to turn now to counsel for Tarrant County. Mr. Adams. Mr. Adams, take it away. Thank you, sir. Good morning. My name is Christian Adams for appellees. May it please the court. Under our Federalist Arrangement in the Constitution, Texas law gives Tarrant County the sovereign power to draw district lines for Commissioner's Court. Appellants here intrude on that power with hollow factual allegations and novel legal theories. They asked this court to reverse the reasoned order of the district court and found as much. First, the district court was correct when it found that any First Amendment attack on redistricting plans are just another way to try to sue over partisan gerrymandering. The Supreme Court in Rucho foreclosed the First Amendment cause of action and the district court got it right on the law. Secondly, the district court did not abuse its discretion when it found the appellant's factual allegations to be hollow. The district court correctly found no likelihood of success because there were no facts supporting a finding of racial intent. None. Appellants seek to intrude on the valid constitutional exercise of state power to organize the government of Tarrant County that reflects the democratic will of the people there and the district court. I'd welcome any questions you may have. How about responding to my question about the dismissal of the First Amendment claims and whether they're before our court on the request for a preliminary injunction? Yes, that raises serious jurisdictional questions that there was a final judgment on the First Amendment cause of action and it raises serious jurisdictional questions whether or not that claim could even be taken up on an interlocutory appeal. Now, what the appellants do is they try to fold it all in and mix it all together with an omnibus request to revoke the denial of the P.I. I think that's an end around that really applies in the face of the limited jurisdiction as to what can be heard on appeal. Is your argument that Rucho basically governs and forecloses all mixed motive maps categorically? Judge Willard, Rucho would be gutted if this cause would be allowed to go forward. The appellant's position would have federal courts reviewing every legislative redistricting to assess disparate impacts on Democrats after the redistricting, particularly on staggered posts. It would open up, for example, the exact same thing happened, but in reverse in Dallas, Harris, Travis, and Barrett County. But is that a yes? Do you think Rucho would govern and prohibit all sort of mixed motive cases? I mean, could a jurisdiction immunize race-based line drawing just by citing politics? It would prohibit the First Amendment claim and it would still allow a 14th or 15th Amendment intent, which is still here. Even though the court found no facts to support a likelihood of success, it's obviously going to go through discovery. But that's another issue here is the posture of this case. There's no developed record. There's pleadings. You can't just get injunctions by filing a complaint, and that's effectively what happened here. And so, Rucho does not tolerate First Amendment impacts on partisan gerrymandering. And I understand the mixed motive question, but the second half of that is a factual question under counts three and four, the constitutional claims. So, you emphasize the county does partisanship as the motive. And my question is, really, how do you separate permissible political intent from impermissible racial intent when they overlap? And I guess to put a point on it, does awareness that partisan choices are going to disproportionately affect minority voters, does that ever, can that ever cross the constitutional line? There's two answers. The first is that the plaintiff has a burden to disentangle those things. That is not a burden on the defendant. And that's an Alexander, I believe, Easley versus Cromartie put the burden on the plaintiff to do the disentangling. But more importantly, more importantly, the district court took that issue up as a factual matter, as a factual matter on the constitutional claims and the intent claims, which can only be reversed if clearly erroneous and decided there were not enough facts to support an intent finding here on the record we have. And so, that factual finding saddles the appellant in this posture, is the district court had to be clearly erroneous. And I'm happy to go through these facts and how the district court got it exactly right. The quote that was referenced earlier was actually a racially, a cross-racial outreach to have minority voters voting for Republicans. It wasn't what the appellant said. In fact, that quote has been either distilled into something else in this argument or not quoted in its full context in the pleadings. Appellant courts treat direct statements by officials that reference both race and politics. Well, what the plaintiffs here would have us do is have people never speak about race. That's essentially what the allegations say, is if you speak about race, it must be racial intent. And especially when you don't say things the plaintiffs agree with. And all of these factual allegations that are presented in the complaint, which the district court found insufficient, just to reemphasize that point, were things like disagreement with ideological opponents. Things that were said by people who weren't even on the commissioner's court anymore years ago. And so, using Arlington Heights, using the standards of Arlington Heights, the district court dismissed these as relevant without probative value. And those findings should control here, unless they're clearly erroneous, which I would submit those of us who've been around long enough and see what the dynamic is about discussion of racial issues, can see that not every time you mention race is it evidence of racial intent. The statement by Judge O'Hare, it's a lot of play in the briefing, was it a response to a question from a reporter? Is that how we got that statement? And if so, what was the question? Yes, Judge Duncan, that reporter's question was never cited in the complaint. It was never cited in the appellant's briefing, but we did finally put it in document 64 in our briefing, the full context of the question. And the question was by a reporter and asking about the plan. And Judge O'Hare's response, and I'm going to paraphrase, I'm not going to read the full quote, it's on page 16 17 of our brief, is to say, look, black voters need to come to the Republican Party. It didn't threaten retribution, as the appellants allege. It didn't say, well, if you don't, we're going to rip you out. That doesn't even go there. It's a cross racial appeal to appeal to minority voters to become Republicans. It's important to realize the district court was familiar and made an assessment about these allegations of racial intent and simply found them wanting. And after clear error, that's the interpretation that binds us here. Okay. Mr. Adams, is it the position of Tarrant County and the Commissioner's Court and Judge O'Hare, does your side concede that race was considered at all? It actually, and that's a factual question Judge Willow will eventually get to, so I'm reluctant to tease the factual situation. Race wasn't considered whatsoever. I think, well, the point of my question was, I was going to follow up with, I mean, how are courts to deal with, how are we to distinguish consideration through motivation? And at what point does using race as a proxy for politics become unconstitutional? Right. It becomes unconstitutional two ways. One, direct evidence of racial intent. This court dealt with that in a case that I was involved in years ago called the United States versus Ike Brown, where there was explicit statements. This was before the Fifth Circuit, approximately 2009. There was explicit statements that race was motivating the defendant in that case. And this court affirmed the Judge Lee's finding in that case, the district court. The other way is through Arlington Heights factors, the five factors under Arlington Heights. And, you know, there they were particularly lacking, and there the district court particularly made a correct decision that they just don't offer evidence that fits the Arlington Heights elements. With that, Your Honor, Appellant's position here assumes that a long line of controlling authority doesn't exist. Rucho, Bernadich, Pettoway, all the staggered cases, Alexander, Jingles, Milligan, they're up against those headwinds. They're assuming that they can create a new novel theory, which they can see, that's their term, to attack the district court. And that's not attack partisan gerrymandering. Now, of course, these cases weren't brought in Dallas, or Harris, or Tarrant, or I'm sorry, Travis, or Behr. But this is the danger here. If we open the floodgates to these disparate impact analyses on partisan impact, the courts are going to be flooded with partisan gerrymandering claims, probably from Republicans and Democrats. And there's really no metric to do it, and the Supreme Court in Rucho forecloses it. I want to briefly address the Dunn case. My colleague said that Dunn versus Blumstein was, I believe she said, and I hate to use the wrong word, so if you'll indulge me, it's fine. I think she set a perfect example, and I apologize if that wasn't the exact terminology. Dunn was not a perfect example. In fact, if you read Dunn, first of all, it's a complete part of voting for anything. Anything. President, dog catcher, legislature, county council. If you read Dunn, it says, this is a quote from the case, the racial residency requirements completely bar from voting all residents. It was a wholesale disenfranchisement. It wasn't the sort of temporary one like in Pate or Carr, where the cases before the Nebraska, California, and Alaska Supreme Courts, unstaggered. Dunn is not a perfect case. In fact, it probably helps the appellants here. So I would disagree that Dunn is a perfect case here. If there's no constitutional right to vote sort of on schedule, are there any circumstances where a mid-cycle redistricting might violate equal protection? Absolutely, but they aren't circumstances here. They're circumstances where a mid-cycle redistricting brazenly sought to disenfranchise a racial minority using direct evidence or like U.S.B.I. Brown or indirect evidence under Arlington Heights. What does the record here tell us about the legitimate, nonpartisan, well, the legitimate justification for a mid-decade instead of waiting until. Sure. Well, the Texas Attorney General, the state of Texas, has filed an amicus brief below in our favor on this. They've said the mid-cycle redistrictings are not a suspect. I think it was the Lulak v. Abbott case when the Supreme Court said the same thing. And more importantly, the voters of Tarrant County in the last election made this a central political issue for the That's what drove this election. There was a promise to go to a 3-1 commissioner's court if the Republicans won, and the Republicans kept that promise. Now, this is premature to talk about the record because there is no record, but based on the record before the district court, they got it exactly right. Redistricting is sometimes referred to as like the politics of politics, and I just wonder about, does this invite manipulation? Whenever power shifts hands in the middle of a term, does it sort of invite manipulation? And if vote postponement is always permissible, then what really prevents the targeted use of that device to kind of sideline and disfavor precincts in Tarrant County? So, appellants raised the issue in briefing that you could just keep doing redistricting year after year with a stagger after a stagger after a stagger and effectively remove the right to vote on a post-seed. And the reply is that that's not what we have here. If you were to have seven, five, maybe even three instances of a over and over, that would change the atmosphere. That would change the analysis, I think. But that's not what we have here. We have a single instance of a stagger right out of hate, right out of car, right out of the authority on stagger. So, we don't reach that point yet of the parade of poor votes that the plaintiffs have suggested. We have one single stagger, and more importantly, there's a constitutional gravity here, Judge Willett. The Constitution gives states the sovereign authority to govern their own affairs, and invasions into that authority have to be rare and awfully justified. And the district court got this right and said the factual record isn't sufficient, and the First Amendment claim doesn't exist. And that's the posture we're in right now, with perhaps a lot of discovery ahead of us. But right now, in this posture, a preliminary injunction was properly denied. And if there's nothing else, I can stand up. Just one final question, and this is kind of a global wrap-up, but it seems that your view is that court should always defer whenever politics and race intertwine. Have I mischaracterized anything? Well, let me try to refine that, just a tip. Okay. It depends on how they intertwine. And for example, in Alexander and the Easley case, the plaintiffs have the burden of decoupling, to disambiguate, to show that there was potential racial gerrymandering. The plaintiffs have offered, the appellants have offered no alternative maps that show that race was the dominating feature, no alternative illustrative plans. They have not disambiguated the two issues. That's their burden. It's not the defendant's burden. So they fail to meet that. Now, in the case where race and politics may intertwine, you're looking at a 15th Amendment issue. If race was a motivating factor, under Rice v. Cayetano, I think U.S. v. Brown goes as far as the Fifth Circuit, if race was a motivating factor, then that's constitutionally impermissible. The plaintiffs have the burden of proving that. And at this posture, factually, they've completely failed to do that. But there could be a circumstance where there's mixed motives and constitutional impermissibility, but that's not what we have here right now. Okay. Mr. Adams, thank you very much. We appreciate your argument. Ms. Lang, we're back to you. And I guess I'll kind of start off with, you know, Mr. Adams makes the point regarding Dunby, Blumstein, or Blumstein, that that case involved a total ban, categorical, on voting. And how is a two-year delay comparable? Your Honor, I mean, so a couple of responses. So with respect to the question of delay, I mean, it was a durational residency requirement that was one year. So it was a one-year delay in access to voting. It was less than it is here. So in that context of timing, you know, Dun was less harm. As to kind of the idea, I think that Mr. Adams was putting forward that Dun was a worse harm because, you know, it applied to all the elections, you know, every election. I think it would be hard to read Dun and say that the state could have, say, a durational residency requirement for Commissioner's Court, but not for an election. I don't think that that would pass muster under Dun. And so I don't think either of those ways of trying to disambiguate Dun really make any sense here. I will say, I think the question about kind of the hypothetical of could you do this in another two years and basically postpone those voters again, and then in another two years, actually proves the point. You know, Mr. Adams says this isn't the case. Okay. But that doesn't change the question of if we're trying to get at what kind of harm is this, and is it actionable? If it would be actionable after seven times or five times or three times, as Mr. Adams says, then it's hard to understand why one time isn't a harm. And in fact, you know, the suggestion that it would have to be five or three, you know, suggests you could basically disenfranchise folks for an entire decade before you would get to some sort of constitutionally cognizable harm. That can't be the case. How would your framework avoid dragging federal courts into supervising every election timing adjustment? You know, I think I would return to the fact that this is a very unique case. These cases have been brought a bunch of times and they always lose. Why do they lose? Because typically when you're doing this, you're doing it to equalize population. You're doing it, you know, to protect staggered elections. You're doing it for all these good government purposes. And under those circumstances, you're going to lose as plaintiffs. But where instead, you know, legislators say, yeah, we know that our staggered elections are going to mean that if we do this redistricting, that is totally unnecessary. 150,000 voters that were up to vote are not going to be able to do so. But we don't like those voters anyhow. And so we're happy to do it. That's not something that happens. And it's not something that our constitution should permit. You know, Mr. Adams talks about the need for kind of judicial deference to state legislatures and the importance of sovereignty. And I agree that our voting cases, you know, take that really seriously. And Rucho, I think, takes that really seriously and says the courts need to step back from micromanaging. At the same time, it's the right to vote. If First Amendment mean anything, it means that when legislators overstep, courts have to be willing to step in. And when legislators have said it's open season on voters, even if we have no reason to redistrict, even if we know that the result is not going to be just dilution, but actual kind of loss of the right to be heard in the next election, that some voters will get to vote every two years and other voters will get to vote only every six. Even under those circumstances, we're going to attack the voters we don't like. That's allowing open season on voters. That's the floodgates. And when Mr. Adams says that this plan could only be cognizable after seven or five or three, but that's exactly the kind of judicially unmanageable standard that we can't find. Where would you draw the line? Is four years of disenfranchisement a viewpoint too much? Ms. Lange, you've only got a few seconds left. Based on your argument today, it appears you've really just focused and you've narrowed your whole claim to the staggered election as opposed to your other claims. I don't want to overstate your position, but is that what you're doing now? You're basing your whole case on the fact that staggered elections going to deprive them of both for two years? This appeal is only about the 2026 disenfranchisement. Yes, your honor. So not the fact that they have staggered elections, they can have staggered elections, but their choice to disenfranchise folks in this manner. Judge Barksdale, in my last few seconds, I want to give you Carson v. American Brands 450 U.S. 79, which is a case that says that when there is an effective denial of a P.I., even if it's not in the city words, that is appealable. 1292 is about allowing appeals when there is an irreparable harm for a lack of an injunction, and those are going to always be appealable, and so I think they're appealable here, your honor. All right, Ms. Lange, thank you very much. Mr. Adams, thank you. We are aware of the short fuse attached to this case. It was expedited to us. Of course, we're having the Zoom argument today to try to get through this as swiftly but as carefully as we can, so we're mindful of the urgency, and we'll do our level best to get an answer as soon as we can, but we're grateful to both of you. Thank you so much, and the case court is adjourned.